COUNTY OF NASSAU, Petitioner, v NEW YORK STATE PUBLIC
EMPLOYMENT RELATIONS BOARD et al., Respondents.

Second Department, November 6, 1989

APPEARANCES OF COUNSEL

*Bee, DeAngelis & Eisman (Peter A. Bee* of counsel), for petitioner.

*Pryor, Cashman, Sherman & Flynn (Richard M. Betheil* of counsel), for Adjunct Faculty Association, respondent.

## OPINION OF THE COURT

BRACKEN, J.

The respondent New York State Public Employment Relations Board (hereinafter PERB) has declared that the petitioner County of Nassau has engaged in an "improper employer practice" *(see,* Civil Service Law § 205 [5] [d]; § 209-a [1] [e]). This "improper employer practice" consists of the county's alleged refusal to continue to abide by a term of a collective bargaining agreement which it, as the sponsor of Nassau

Community College (hereinafter the college), entered into with the respondent Adjunct Faculty Association of that college (hereinafter the union). The collective bargaining agreement expired in 1984.

■ PERB's determination *(Matter of County of Nassau [Adjunct Faculty Assn.],* 20 PERB ¶ 3036) is premised on its conclusion that the college, pursuant to its agreement with the union, is obliged to deem each member of the adjunct faculty to be academically qualified to teach whatever course or courses that teacher has taught at the college at any time in the past. We find, however, that the contract in question does not so provide. Clearly, there is no explicit term in the contract which so states, and the only provision of the contract which deals directly with the subject of academic qualification, i.e., paragraph 10.1 (e), implies precisely the opposite, by providing that a representative of the college may, in each successive academic year, select those adjunct teachers whom the college considers qualified to teach whatever courses are planned to be offered.* Although this provision also states that the college's representative must "act in concert" with the union in making his annual decisions as to which adjunct teachers are qualified to teach which courses, this clause of the agreement does not deprive the college's delegate of his authority to declare that a particular adjunct teacher is *not* qualified to teach a particular course. In the event that the college declares an adjunct teacher unqualified, and the union declares him qualified, so that no "acting in concert" pursuant to paragraph 10.1 (e) is possible, recourse may be had to a grievance procedure.

■ The central question to be decided in this proceeding is thus quite narrow, i.e., whether the collective bargaining agreement at issue affirmatively precludes the college from reassessing the academic qualifications of incumbent members of its adjunct faculty. Since the agreement simply does not do so, PERB's finding of an improper employer practice must be vacated. We also hold that the determination by PERB which is now under review must be vacated in its entirety because it is violative of the doctrine of res judicata. All of the issues raised by the union on behalf of the adjunct teachers who

---

* Section 10.1 (e) of the agreement provides, in full, as follows: "10. 1 (e) Each adjunct department will maintain a list of courses for which each adjunct faculty member is academically qualified. This list will be prepared and updated annually by the department's adjunct supervising administrator in concert with the Adjunct Faculty Association".

claim to be aggrieved were, or could have been, raised in an earlier improper employer practice proceeding which was resolved by PERB in the college's favor.

I

Consideration of the issues raised in this proceeding must begin with an examination of the provisions of the collective bargaining agreement entered into between the county and the union. The county is a party to the agreement by virtue of its sponsorship of the college, an institution which is administered, in accordance with the law, by a Board of Trustees *(see,* Education Law § 6301 *et seq.).* The Board of Trustees is also a party to the collective bargaining agreement.

Although there are over 800 teachers employed as members of the college's adjunct faculty, the president of the college is allowed, under the terms of paragraph 10.1 (a) of the parties' agreement, to appoint only 30 adjunct faculty members each semester. The union is permitted to make 30 appointments of its own, without the approval of any officer of the college (para 10.1 [b], [a] [2]). Additional appointments must be made "in concert with, and with the agreement of [the union]" (para 10.1 [a]). In the event that the union does not approve of a particular appointment, it may commence a grievance proceeding (para 10.1 [n]). A review of the provisions mentioned above, in their entirety, indicates that the college has, in large measure, bargained away its right to determine unilaterally who is fit to serve as a member of its adjunct faculty. In theory, if not in practice, the union has the contractual right to disapprove all but 30 appointments, and thus, in effect, to force the college to appoint as adjunct teachers only those who meet with its approval.

The parties' agreement further provides that each academic department "will maintain a list of courses for which each adjunct faculty member is academically qualified" (para 10.1 [e]). However, just as the "appointment" of all but 30 members of the adjunct faculty requires the consent of the union *(see,* para 10.1 [a], [b]), so also the union has veto power with respect to any determination as to which teachers are qualified to teach each of the various courses offered at a particular time. This is so because paragraph 10.1 (e) of the agreement provides that each departmental list of qualified teachers must "be prepared and updated annually by the department's adjunct supervising administrator in concert with the Adjunct Faculty Association".

The agreement also provides that each department, in addition to preparing a list designating the courses which each adjunct faculty member is qualified to teach (para 10.1 [e]), must also prepare a list reflecting, in descending order, the adjunct faculty members who have completed the most semesters of prior adjunct service. According to the agreement, "[a]ppointments will be made to the adjunct faculty based on the number of semesters of prior adjunct service" (para 10.1) and "[s]eniority is accumulated and implemented on a department basis" (para 10.1 [c]).

The operation of these various provisions may best be illustrated by example. If, within a particular department, two adjunct teachers are each listed as qualified to teach a particular course (para 10.1 [e]), and each of them is available to teach that course during a particular semester, then the appointment would go to that teacher who has taught *any* course within the department for the most number of semesters, even though that teacher may be far less experienced in teaching the particular course in question, and far less qualified to teach it. This is so because under the terms of the parties' agreement, seniority is determined on a department-wide, rather than on a coursewide, basis (paragraph 10.1 [c]), and because any determination respecting a teacher's fitness to teach a particular course is to be made on an all or nothing basis; the parties' agreement does not recognize the possibility that, between two qualified individuals, one—and perhaps the one with *less* seniority—may be the *more* qualified to teach a particular course.

The contract between the parties also contains a section entitled "probation" which provides that, during the first semester of any adjunct teacher's employment, he or she may be discharged "in the event of unsatisfactory [classroom] observations on two distinct occasions" (para 18.1). This section expressly provides that the probationary period shall last only for the first semester of an adjunct appointee's employment. Thus, a dismissal based upon two "unsatisfactory observations" may not take place, pursuant to this section, during the second semester of an adjunct appointee's employment, or in any subsequent semester, even though he or she may be teaching other courses with demonstrably less effectiveness than he or she displayed teaching a different course during his or her first semester. After the one-semester probationary period has ended, "[n]o adjunct faculty member shall be removed from a department seniority list for incompetent

service unless he had received three (3) unsatisfactory evaluations in an academic year. One of these must be by a neutral observer" (para 19.9). A postprobationary adjunct teacher who is discharged pursuant to this paragraph has the contractual right to commence a grievance procedure which culminates in arbitration (paras 19.12, 22.2 [b], [d]).

## II

Although the parties' collective bargaining agreement expired on September 30, 1984, pursuant to Civil Service Law § 209-a (1) (e), as amended in 1982, the college may not "refuse to continue all the terms of an expired agreement until a new agreement is negotiated". The college must therefore continue to abide by the terms of this agreement, and we assume, without deciding, that this includes those terms which relate to matters which are not the subject of mandatory bargaining (see, Governor's mem approving L 1982, ch 868, 1982 McKinney's Session Laws of NY, at 2631, 2632; *Matter of Board of Trustees [Maplewood Teachers' Assn.]*, 57 NY2d 1025; *cf., Matter of Board of Coop. Educ. Servs. v New York State Pub. Employment Relations Bd.*, 41 NY2d 753; *see also, Matter of Cobleskill Cent. School Dist. v Newman,* 105 AD2d 564, 565; *Matter of County of Niagara v Newman,* 104 AD2d 1). Since the expiration of the contract, the college and the union have had no success in negotiating a successor agreement, as the events described below will reveal.

On September 12, 1985, the president of the college, Sean A. Fannelli, wrote a letter to John Meehan, the president of the Adjunct Faculty Association. In this letter, the college president stated, among other things, that "effective for the Spring 1986 semester adjunct faculty appointments and thereafter, *the college will no longer honor the seniority provisions of your contract to the extent that they may require that adjunct course assignment[s] be made solely on the basis of seniority"* (emphasis added). The college president advised the president of the union that the chair of each department was to be directed to "make assignments on a basis consistent with academic and student need and *in the same manner as daytime faculty* assignments" (emphasis added). The letter further stated that "[a]ll faculty in the institution will be uniformly evaluated within each department consistent with sound academic policy". In light of the petitioner's sworn statements submitted in this proceeding, which statements are unrebut-

ted, it is clear that the president's decision to impose uniform standards on *all* faculty members throughout the college was prompted by the prospect that if such uniformity is not achieved, the college will forfeit its accreditation, and thus fail to fulfill its statutory mandate that it offer its students an academic program comparable to that offered in "institutions providing regular four-year courses" (Education Law § 6303 [3]).

Several days later, the union responded to this letter by filing an improper employer practice charge with PERB based, among other things, on allegations that the actions threatened to be taken by the college would violate the terms of Civil Service Law § 209-a (1) (e). The PERB Administrative Law Judge, in a determination dated February 24, 1986, *dismissed* this charge after a hearing, finding that the parties' contract "did not require that assignments be made based upon seniority alone". Instead, the Administrative Law Judge found that the provisions of the contract with respect to "eligibility and qualifications" take precedence over the provisions respecting seniority, and that the college's "right to determine qualifications is unrestricted". Since, under this interpretation, the parties' agreement does not require course assignments to be made based on seniority alone, the Administrative Law Judge held that the college's stated intent not to employ seniority as the sole criterion in making assignments could not be considered violative of Civil Service Law § 209-a (1) (e) *(Matter of County of Nassau [Adjunct Faculty Assn.],* 19 PERB ¶ 4518).

On appeal, PERB affirmed this determination of its Administrative Law Judge in a determination dated June 5, 1986. PERB noted in its determination that there was no evidence to support the union's argument that, even if the college was not contractually bound to make course assignments based on seniority alone, that was in fact the college's "practice" *(Matter of County of Nassau [Adjunct Faculty Assn.],* 19 PERB ¶ 3040, at 3088).

In the meantime, in November 1985 the college set out to do precisely that which, in its president's letter dated September 12, 1985, it advised the union it *would* do, and precisely that which, in rejecting the union's subsequent *improper* practice charge, PERB indicated it *could* do. It directed the chairperson of each department to draw up lists designating which adjunct faculty were qualified to teach the courses to be offered in the spring of 1986, in accordance with stated qualifications. Out of the over 800 adjunct faculty members, only a

very few were disqualified from teaching any course, and of these, several were reinstated after a step II grievance pursuant to the grievance procedure outlined in the parties' contract. Several more adjunct teachers, considered unqualified by the college, were ordered reinstated after a step III grievance. That grievance procedure resulted in an arbitration award, dated November 12, 1987, which was confirmed by the Supreme Court, Nassau County, by judgment entered February 22, 1988.

### III

The present improper employer practice charge was filed on January 27, 1986, and alleges that the college has refused to continue to adhere to the terms of the expired agreement in that certain senior adjunct faculty members have been declared unqualified to teach any available course. According to the language of the charge, "[t]hese [adjunct faculty] members had been deemed to be qualified many years ago [and] [n]o discussions over changing the qualifications to teach were conducted".

In a decision dated December 19, 1986, a PERB Administrative Law Judge, after a hearing, dismissed this charge. In her decision, the Administrative Law Judge stated that it was the union's position that the subject collective bargaining agreement provides that "any adjunct faculty member who previously had successfully taught a course [is deemed] qualified to teach that course in the future". The Administrative Law Judge stated that it was the union's position that the terms of the collective bargaining agreement preclude "the College from altering its qualifications for employment as to individuals once hired" *(Matter of County of Nassau [Adjunct Faculty Assn.]*, 19 PERB ¶ 4629, at 4821).

The union sought review by PERB of the decision of the Administrative Law Judge. In its statement of exceptions to the decision of the Administrative Law Judge, the union argued, *inter alia,* that "[t]he Administrative Law Judge erred in failing to find that in the past the employer has deemed an adjunct professor who had successfully taught a course once as qualified to teach that course in the future". Furthermore, the union also argued that the Administrative Law Judge erred in failing to find that once an adjunct faculty member had completed the one-semester probationary period, he or she must be deemed qualified "to teach [presumably every course]

in the relevant department". In the determination under review dated July 8, 1987, PERB reversed the decision of its Administrative Law Judge, and ordered the petitioner "[f]orthwith [to] rescind its determinations that adjunct faculty members who had previously been placed on the seniority list are no longer academically qualified". The county was also directed to comply with paragraph 10.1 (e) of the collective bargaining agreement.

■ The PERB determination under review includes three decretal paragraphs of which only the first two are substantially relevant. The second of these directs the college to comply with paragraph 10.1 (e) of the collective bargaining agreement, which, as noted above, requires the college to act "in concert" with the union in compiling annual lists of qualified teachers. To the extent that this directive requires the college merely to consult with the union in deciding what the appropriate qualifications for each teaching position should be, and to the extent that it recognizes that the college may not unilaterally determine which adjunct teachers are qualified to teach which courses, we find that it accurately reflects the terms of the subject contract. However, to the extent that it requires the college to consider all adjunct teachers qualified to teach whatever course they taught in the past, we find that it is unsupported by the actual text and meaning of the parties' agreement.

As we interpret its determination, PERB in fact held that every adjunct faculty member must be considered qualified to teach any course which that teacher has taught at any time in the past. The rationale expressed by PERB is that since the college has always acted unilaterally in making the initial appointment of an adjunct faculty member to teach a particular course, the college is bound by the approval of the teacher's qualifications which is necessarily implicit in such an appointment. PERB determined, in the language of its decision, that "the parties' contract binds the college to its earlier decisions regarding academic qualifications".

For the following reasons, we hold (1) that this finding of an improper employer practice, premised on an alleged violation of an expired collective bargaining agreement, is based on a misinterpretation of that agreement, and (2) that the determination under review is directly contradictory to a prior determination which involved the identical issues, and is hence violative of the principles of res judicata.

## IV

PERB's determination that the expired collective bargaining agreement requires the college to consider each adjunct faculty member as qualified to teach any course that the adjunct faculty member has taught at any time in the past, is, in our opinion, based upon an irrational construction of the parties' agreement. For this reason alone, the finding that the college committed an improper employer practice (Civil Service Law § 209-a [1] [e]), which is premised on the college's refusal to consider as qualified certain adjunct faculty members who have taught courses in the past, is arbitrary.

While the courts will ordinarily defer to the construction by PERB of provisions of Civil Service Law § 200 *et seq.*, since PERB is the agency responsible for enforcing those provisions *(e.g., Matter of Town of Mamaroneck PBA v New York State Pub. Employment Relations Bd.,* 66 NY2d 722, 724; *Matter of Incorporated Vil. of Lynbrook v New York State Pub. Employment Relations Bd.,* 48 NY2d 398, 404), it is questionable whether such deference should be afforded PERB's constructions of other laws *(see, Matter of Town of Mamaroneck PBA v New York State Pub. Employment Relations Bd.,* 66 NY2d 722, *supra; Matter of City School Dist. v New York State Pub. Employment Relations Bd.,* 144 AD2d 35, 38) or its interpretations of public employment contracts. PERB does not ordinarily have jurisdiction to enforce the terms of public employment contracts, and may take jurisdiction over claimed violations of such contracts only when such a violation also constitutes an improper employer practice, as defined in Civil Service Law § 209-a (1) *(see,* Civil Service Law § 205 [5] [d]; *see also, Matter of Jefferson County Bd. of Supervisors v New York State Pub. Employment Relations Bd.,* 36 NY2d 534). In the present case, PERB was required to interpret the terms of the subject agreement respecting the qualifications and seniority of adjunct faculty members in order to resolve the union's claim that the college had acted improperly in refusing to continue to confer certain benefits and protections supposedly contained in those provisions of the agreement (Civil Service Law § 209-a [1] [e]).

PERB's construction of the agreement is irrational for the basic reason that it renders the terms of paragraph 10.1 (e) thereof largely superfluous. As noted above, that paragraph requires the union and the college to act "in concert" in promulgating *annual* lists designating, for each department,

those courses which each of the adjunct teachers, whose names appear on the separate seniority lists, are qualified to teach. Under the explicit terms of this paragraph, such lists, designating the extent of each adjunct teacher's qualifications, are to be updated every year, and are to include the names of every member of the adjunct faculty. Since PERB has held that every adjunct faculty member whose name appears on the seniority list (i.e., every adjunct teacher who has completed the one-semester probationary period) must be deemed qualified to teach any course which that teacher ever taught, there would be no need to draw up the list contemplated by paragraph 10.1 (e), except in order to indicate which adjunct teachers are qualified to teach a course which has never been taught before or to indicate which adjunct teachers are qualified to teach courses for which no teacher named on the seniority list is available. Otherwise, the determination as to which adjunct teachers are qualified to teach which courses would be a function simply of noting whether a particular teacher ever taught a particular course.

■ PERB's interpretation of the contract is erroneous for a more basic reason. In declaring that the subject agreement guarantees that each adjunct faculty member must be deemed permanently qualified to teach whatever courses that faculty member has taught in the past, PERB relied upon the existence of the one-semester probationary period set forth in paragraph 18.1. PERB reasoned that the college did not abdicate its responsibility for the maintenance of academic quality, since the college, pursuant to paragraph 18.1, may unilaterally dismiss any teacher during this probationary period, thus guaranteeing that only qualified teachers could obtain what PERB itself characterized as "tenure". This reasoning is valid only if it is assumed that an adjunct faculty member undergoes a probationary period for each new course he or she teaches. However, the probationary period provided for in paragraph 18.1 is expressly limited to one semester only, so such an assumption is clearly incorrect. An adjunct teacher who is assigned to teach a different course in his or her *second* semester of employment may *not* be dismissed pursuant to paragraph 18.1, and thus the college, under PERB's interpretation of the contract, *could* be compelled forever to "deem" a teacher qualified to teach a particular course based on nothing more than the initial appointment, and without any opportunity for performance review pursuant to paragraph 18.1.

■ PERB's reliance upon paragraph 18.1 of the parties' contract in reaching its conclusion that all postprobationary adjunct teachers must be deemed qualified to teach whatever courses they have taught in the past is misplaced for another basic reason. Paragraph 18.1 of the contract permits the college to dismiss an adjunct teacher during his or her first semester of service based upon two separate observations of inadequate classroom performance. It is clear, then, that this provision of the contract furnishes a mechanism by which the college may summarily deal with a teacher who is found to be incompetent. PERB failed to appreciate what we consider to be the fundamental distinction between the concept of *competence,* on the one hand, and the concept of *qualifications,* on the other.

A public employee is "qualified" for a position when he or she meets the conditions which the New York State Constitution, or the Legislature, or the appointing authority sets for eligibility to serve in that position, and these qualifications may relate to matters of age, residency, citizenship and so forth *(see, e.g.,* Civil Service Law §§ 53, 23 [4-a]; 19 NY Jur 2d, Civil Servants and Other Public Officers and Employees, §§ 299-304) or, as in the present case, they may relate to the possession of academic degrees *(see generally,* 63A Am Jur 2d, Public Officers and Employees, § 44; *see also, Matter of Cowen v Reavy,* 283 NY 232; *Matter of Rosner v Civil Serv. Commn.,* 38 AD2d 628 [certification by American Board of Neurological Surgery may be condition of promotion of neurologist employed as medical specialist]). In the context of primary or secondary education, for example, the requirement that teachers be certified or licensed is a qualification for employment *(see, e.g., Matter of Bradford Cent. School Dist. v Ambach,* 56 NY2d 158; *see also, Matter of Meliti v Nyquist,* 41 NY2d 183; *Matter of Linton v Board of Educ.,* 47 NY2d 726; *Matter of Amos v Board of Educ.,* 43 NY2d 706, *affg* 54 AD2d 297; *Matter of Bali v Board of Educ.,* 68 AD2d 360, 366 [Simons, J., dissenting]).

Obviously it is possible that an individual who satisfies the prescribed conditions of employment and who is thus "qualified" may nevertheless be incompetent, due to indolence, irresponsibility, or any of several other factors. In the context of secondary education, for example, a teacher must not only possess the appropriate qualifications (certification) but must also, as a separate matter, demonstrate competence by com-

pleting a probationary period prior to being granted tenure. Paragraph 18.1 of the contract under review in the present proceeding explicitly provides for a "probationary" period, and thus is designed to enable the college to remove the incompetent teacher, irrespective of his or her qualifications. PERB erred when it construed this section of the agreement as limiting the right of the college to define what the applicable qualifications for teaching various courses should be, for that is a subject which is entirely different, and which is covered by an entirely different provision of the contract, to wit, paragraph 10.1 (e).

We find that the subject contract does not contain the term which PERB found that it did contain, i.e., a term which compels the college to recognize every adjunct teacher as forever qualified to teach certain courses. The college has the right, pursuant to paragraph 10.1 (e) of the contract, to declare *any* adjunct teacher unqualified to teach *any* course. The college—and, for that matter, the union—is free, pursuant to the terms of paragraph 10.1 (e), to declare an incumbent adjunct faculty member who has served competently to be unqualified to teach in the future by virtue of the application of academic standards which did not exist at the time the teacher was hired. An adjunct teacher who feels aggrieved by such a decision on the part of the college may initiate a grievance procedure. However, such a decision by the college may not be considered an improper employer practice pursuant to Civil Service Law § 209-a (1) (e). Whether it would be violative of public policy if such a grievance procedure were to culminate in an award requiring the college to employ an adjunct teacher who, when measured against current standards, is considered unqualified, is a question which we need not reach.

For the foregoing reasons, we cannot accept PERB's construction of the subject agreement. No rational interpretation can lead to the conclusion that the college agreed, under the terms of this contract, permanently to consider adjunct teachers qualified to teach whatever courses they taught in the past. Instead, we construe the contract in accordance with its plain terms, and hold that, pursuant to paragraph 10.1 (e) thereof, the college may, acting "in concert" with the union, update its departmental qualification lists annually and, in so doing, reevaluate the qualifications of each of its adjunct faculty. The contract further provides for a grievance proce-

dure to resolve disputes which arise when no acting "in concert" is possible.

## V

■ The PERB determination under review must be vacated for the additional reason that it is in direct contravention of a previous PERB determination dated June 5, 1986, made in connection with a previous improper employer practice charge involving the same parties.

As we previously noted, in September 1985 the president of the college informed the union, in unequivocal terms, that it was the college's intention to disregard the provisions of the subject collective bargaining agreement "to the extent that they may require that adjunct course assignment[s] be made solely on the basis of seniority". The college president advised the union that adjunct faculty members would be judged by the same standards as apply to full-time faculty.

The union responded by bringing an improper employer practice charge. The PERB Administrative Law Judge, in a decision dated February 24, 1986, dismissed the improper employer charge to the extent that it was made pursuant to Civil Service Law § 209-a (1) (e) on the ground that, contrary to the union's argument, "the contract did not require that assignments be made based upon seniority alone". The Administrative Law Judge went further and held that the charge had no merit to the extent that it was premised on Civil Service Law § 209-a (1) (d), because "the College is free, at its discretion, to consider qualifications necessary to meeting academic and student need in making assignments".

PERB, in a determination dated June 5, 1986, confirmed this determination. The issue was stated succinctly by PERB as whether "the College violated the Law by refusing to continue the term of an expired agreement which requires the assignment of courses to unit employees solely on the basis of seniority". By confirming the dismissal of the charge, PERB necessarily answered this question in the negative, and held that the subject contract does not require the college to make course assignments on the basis of seniority alone.

In the present case, however, which emanates from the union's second improper employer practice charge, PERB has answered the very same question, i.e., whether the college is contractually obligated to make adjunct course assignment on the basis of seniority alone, in the affirmative. As noted above,

PERB's determination in the present case is that each adjunct teacher whose name appears on the seniority list must be deemed qualified to teach any course he or she has taught in the past. This is, in effect, a determination that seniority *is* the sole criterion for assignment of adjunct teachers. The PERB determination now before us prohibits the college from assigning to any particular course an adjunct teacher who, while more qualified to teach that course, is lower on the departmentwide seniority list than any other qualified teacher (that is any other teacher who has ever taught that course in the past). Thus, the college must make assignments on the basis of seniority alone, the very thing which, in its earlier determination, PERB had held that the college was not required to do. In its first determination, PERB authorized the college to assign a more qualified, but less senior, teacher to teach a course for which a more senior, but less qualified teacher was available. In its second determination, PERB took this authorization away.

Viewed from a different perspective, PERB's prior determination was to the effect that the college could, consistent with its contract, apply to the adjunct faculty members the same criteria for the determination of qualifications as apply to the regular faculty. It is noteworthy that, as of November 1985 *before* PERB's Administrative Law Judge had made her ruling in connection with the prior charge, the union knew or should have known that the college was going to implement—and was, in fact, already unilaterally implementing—its stated intention of bringing the standards governing academic qualifications applicable to the adjunct faculty into conformity with those governing the regular faculty. The decision of the PERB Administrative Law Judge, confirmed by PERB, necessarily included a holding that the college's conduct in this respect was not improper. There is absolutely no evidence that the college has done anything other than that which it promised it would do, and other than that which PERB held that it could do, i.e., to bring the adjunct faculty into parity with the regular faculty with respect to academic qualifications. This very same practice—applying to the adjunct faculty the same standards as apply to the regular faculty—has thus been subject to review by PERB on two occasions, with opposite results: first, the practice was held proper; then it was held improper. This repugnancy must be considered arbitrary.

■ There is no question that "the doctrines of *res judicata* [claim preclusion] and collateral estoppel [issue preclusion] are

applicable to give conclusive effect to the quasi-judicial determinations of administrative agencies" *(Ryan v New York Tel. Co.,* 62 NY2d 494, 499, citing *Matter of Evans v Monaghan,* 306 NY 312, 323-324; *Parklane Hosiery Co. v Shore,* 439 US 322; *see also, Allied Chem. v Niagara Mohawk Power Corp.,* 72 NY2d 271, 276-277). The doctrine of claim preclusion rests upon the all-important principle that " ' "[j]ustice requires that every cause be once fairly and impartially tried; but the public tranquillity demands that, having been once so tried, all litigation of that question, and between those parties, should be closed forever" ' " *(Ryan v New York Tel. Co., supra,* at 500, quoting *Fish v Vanderlip,* 218 NY 29, 37, quoting Greenleaf, Evidence §§ 522, 523). In the present case, the teachers' union filed a second improper employer practice charge before the first charge had been finally determined, and then pursued it in order to induce PERB to reach a conclusion in the second proceeding which directly impeached the validity of the determination reached in the first proceeding. This violation of the principle of res judicata cannot be countenanced.

PERB attempted to justify its apparent circumvention of the principles of claim preclusion by explaining, in the decision written in support of the determination under review, that the union had not argued, in connection with the previous improper employer practice charge, that the college had explicitly or implicitly agreed never to review or to reassess the qualifications of the postprobationary members of its adjunct faculty. According to PERB, since the union had not made this specific argument in the earlier proceeding, it was free to make it in the subsequent proceeding, and since PERB had not considered this argument in the earlier proceeding, it was free to consider it in the subsequent one. This reasoning is clearly inconsistent with the transactional approach to the doctrine of res judicata which has been adopted in New York.

The doctrine of res judicata prohibits a party from relitigating any claim which could have been or which should have been litigated in a prior proceeding *(see, Hyman v Hillelson,* 79 AD2d 725, 726, *affd* 55 NY2d 624). Pursuant to the doctrine of res judicata, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy" *(O'Brien v City of Syracuse,* 54 NY2d 353, 357; *see also, Smith v Russell Sage Coll.,* 54 NY2d 185; *Matter of Reilly v Reid,* 45 NY2d 24;

*Feigen v Advance Capital Mgt. Corp.,* 146 AD2d 556, 558; *Yerg v Board of Educ.,* 141 AD2d 537, 538; Restatement [Second] of Judgments § 24). Thus, whether the union actually advanced its present argument in the earlier proceeding, and whether PERB actually considered it, is irrelevant. All that matters is that the argument *could have been* made by the union in the prior proceeding but was not.

The "transaction" at issue in the present case is the decision by the college to impose upon its adjunct faculty academic qualifications identical to those which are applicable to the full-time faculty. The union challenged this policy once, shortly after it was announced, and its improper employer practice claims before PERB were defeated. The present proceeding is thus barred by principles of res judicata unless it can be said to relate to a "transaction" which is different from that which was the subject of the prior proceeding. While it is true that the college's policy may have produced additional consequences *(e.g.,* the disqualification of particular teachers) in the interval between the two proceedings, the rule is that "successive * * * acts which though occurring over a period of time were substantially of the same sort and similarly motivated" must be considered part of the same "transaction" for res judicata purposes (Restatement [Second] of Judgments § 24, comment d, at 201). In short, PERB "afford[ed] [the union] a second opportunity to obtain substantially the same relief [it] was denied in the prior proceeding, based on the same actions of [the college]" *(Matter of Reilly v Reid,* 45 NY2d 24, 31, *supra).*

## VI

In light of the foregoing, the petitioners' remaining contentions addressed to the issues of timeliness and public policy have not been reached. Accordingly, the petition is granted, on the law, with costs, the determination is annulled, and the improper employer practice charge is dismissed.

BROWN, J. (concurring in part and dissenting in part). I concur in the majority opinion to the extent that it would vacate, upon res judicata grounds, so much of PERB's determination as concludes that the collective bargaining agreement between the parties precludes the college from determining that adjunct faculty members who had previously been considered academically qualified are no longer so qualified solely on the basis of newly imposed standards of academic qualifica-

tion. The union was aware that the college intended to engage in this practice when it brought the first improper employer practice charge in September 1985. In fact, it was this awareness which caused the union to bring that first charge. At that time, the union could have and should have raised the issue it raised before PERB in the proceeding now under review. Having failed to do so, it is precluded from doing so now (see, O'Brien v City of Syracuse, 54 NY2d 353).

I do not agree, however, that the union's contention that the college violated paragraph 10.1 (e) of the collective bargaining agreement by failing to act in concert with the union to update its departmental lists annually and, in so doing, re-evaluate the qualifications of each of its adjunct faculty, is similarly barred by the doctrine of res judicata. The violation complained of did not occur until after the initial improper employer practice charge was filed, and thus this contention could not have been raised in that prior proceeding. Accordingly, I would reach the merits of the union's claim in this regard and, in so doing, would agree therewith. Paragraph 10.1 (e) of the parties' collective bargaining agreement represents a bargained-for covenant that a list of courses for which each adjunct faculty member is academically qualified, "will be prepared and updated annually by the department's adjunct supervising administrator in concert with the Adjunct Faculty Association". The college effectively ignored this provision and unilaterally determined which of the adjunct faculty was qualified to teach particular courses. This conduct clearly violated the collective bargaining agreement and, therefore, I conclude that PERB's determination, to the extent that it requires the college to fulfill its obligation under the contract, should be confirmed.

In light of the foregoing, I do not deem it necessary to reach the remaining issues passed upon in the majority opinion.

Accordingly, I vote to grant the petition to the extent of annulling so much of the determination as required the petitioner to retain as qualified all members of the adjunct faculty whom it previously determined to be qualified, deleting the first decretal paragraph thereof and so much of the second and third decretal paragraphs thereof as require the petitioner to do so, and dismissing that portion of the improper employer practice charge, and I otherwise dissent and vote to confirm the remainder of the determination and dismiss the remainder of the proceeding on the merits.

THOMPSON, J. P., and SULLIVAN, J., concur with BRACKEN, J.; BROWN, J., concurs in part and dissents in part in a separate opinion.

Adjudged that the petition is granted, on the law, with costs, the determination is annulled, and the improper employer practice charge is dismissed.