In the Matter of John T. Meehan, Respondent, v Nassau Community College, Appellant.

Second Department, December 11, 1989

**APPEARANCES OF COUNSEL**

*Bee, DeAngelis & Eisman (Peter M. Bee* of counsel), for appellant.

*Pryor, Cashman, Sherman & Flynn (Richard M. Betheil* of counsel), for respondent.

### OPINION OF THE COURT

KOOPER, J.

The issue to be resolved on appeal is whether the construction accorded the parties' collective bargaining agreement in an arbitration award impermissibly narrows the appellant's authority to prescribe and establish academic qualifications in making teaching assignments to incumbent personnel. For the reasons that follow, we answer that question in the affirmative.

## I

In or about 1982, Nassau Community College (hereinafter the College) and its Adjunct Faculty Association entered into a collective bargaining agreement (hereinafter the agreement) which, *inter alia,* governs the appointment of teachers to the adjunct staff. Insofar as pertinent, the contract provides that each department of the College is to prepare a list of teachers ranked by the length of prior adjunct service. Specifically, the agreement requires that, "[a]ppointment will be made to the adjunct faculty based on the number of semesters of prior adjunct service" (§ 10.1) and states that seniority "is accumulated on a departmental basis" (§ 10.1 [c]). Section 10.1 (f) states, in part, that "[s]eniority preference will be given to eligible members on the official department seniority list". Section 10.1 (e) of the agreement provides that "[e]ach adjunct department will maintain a list of courses for which each adjunct faculty member is qualified. This list will be prepared and updated annually by the department's adjunct supervising administrator in concert with the Adjunct Faculty Association". The contract also contains a section entitled, "PROBATION", which provides that, during the first semester of any adjunct teacher's employment, he or she may be discharged "in the event of unsatisfactory observations on two distinct occasions" (§ 18.1). After the one-semester probationary period has terminated, the contract states that "[n]o adjunct faculty member shall be removed from a departmental seniority list for incompetent service unless he had received three (3) unsatisfactory evaluations in an academic year" (§ 19.9).[1]

---

1. Other provisions of the collective bargaining agreement confer upon

## II

In 1985, the College administration informed the Adjunct Faculty Association that commencing with the 1986 semester, adjunct faculty assignments would no longer be made in conformity with the agreement insofar as it required the assignment to be premised solely on the basis of seniority. Rather, the assignments would be premised on a "basis consistent with academic and student need in the same manner as day time faculty assignments". According to the College, a principal reason underlying its decision to apply day-school standards to its adjunct faculty was a warning it had received from the Middle States Association Commission on Higher Education—the institution overseeing the College's accreditation—that the College's method of assigning adjunct teachers based solely on seniority was contrary to the Commission's accrediting criteria.

Thereafter, the College established lists of adjunct faculty members whom it determined were academically qualified based upon criteria applicable to the day faculty.[2] Grievances were subsequently instituted on behalf of certain adjunct faculty members who were affected by the application of the new criteria. A three-member, "step three" Grievance Board ultimately determined, by a 2 to 1 vote, that the College had violated the agreement by declining to make course assignments to teachers qualified under the seniority provisions of the agreement and by compiling lists of faculty members it deemed qualified to teach.

When the college declined to abide by the determination of the Grievance Board, and continued to make course assignments from the lists it had drawn, the president of the Adjunct Faculty Association moved by verified petition in the Supreme Court, Nassau County, to confirm the award of the

the Adjunct Faculty Association a broad role in the appointment of adjunct teachers. Under the terms of the agreement the president of the College is permitted to make only 30 adjunct appointments without the input of the Adjunct Faculty Association (§ 10.1 [a]). Further, the union is permitted to make 30 appointments of its own, without the College's approval (§ 10.1 [a] [2]; [b]).

2. The Adjunct Faculty Association has not argued that the College acted in bad faith by reassessing teacher qualifications, i.e., there is no contention that the reassessment was motivated by anything other than the desire to upgrade academic standards. Nor has the Adjunct Faculty Association alleged that the new standards themselves are academically unreasonable or irrational.

Grievance Board. By judgment entered February 22, 1988, the Supreme Court granted the petition to confirm the award.

On appeal from the Supreme Court's determination, the College's sole contention is that the Grievance Board's decision is violative of public policy, inasmuch as it has the effect of requiring the College to assign courses to adjunct teachers even though those teachers do not possess the academic qualifications set by the College's administration. We agree.

## III

The principles which underlie our determination are derived from numerous authorities which recognize an inherent, nondelegable power in public authorities to oversee and establish academic standards. In this regard, it has been widely recognized that public authorities responsible for the administration of State-financed schools may not surrender their statutory obligation to maintain academic standards *(see, e.g.,* Civil Service Law § 35 [i]; Education Law § 6306 [2]; *Honeoye Falls-Lima Cent. School Dist. v Honeoye Falls-Lima Educ. Assn.,* 49 NY2d 732; *Matter of Cohoes City School Dist. v Cohoes Teachers Assn.,* 40 NY2d 774; *Board of Educ. v Areman,* 41 NY2d 527, 532; *Sweet Home Cent. School Dist. v Sweet Home Educ. Assn.],* 90 AD2d 683, *affd* 58 NY2d 912; *Matter of Riverhead Cent. School Dist. v Riverhead Cent. Faculty Assn.,* 140 AD2d 526, 528; *Matter of Board of Educ. v Yonkers Fedn. of Teachers,* 129 AD2d 702; *Matter of Enlarged City School Dist. [Troy Teachers Assn.],* 117 AD2d 58, *revd on other grounds* 69 NY2d 905; *Matter of Three Vil. Teachers' Assn. v Three Vil. Cent. School Dist.,* 128 AD2d 626, 627, *affg* 129 Misc 2d 920; *Matter of Monroe-Woodbury Cent. School Dist. v Monroe-Woodbury Teachers Assn.,* 105 AD2d 786). The Court of Appeals has observed in this respect that, "[d]ifferent from private matters where freedom to contract is virtually unlimited, public school matters are, from time to time, subject to restrictive policies which reflect governmental interests and public concerns" *(Board of Educ. v Areman,* 41 NY2d 527, 531, *supra).* As the court further stated in a somewhat different, but analogous context, "[b]oards of education are but representatives of the public interest and the public interest must, certainly at times, bind these representatives and limit or restrict their power to, in turn, bind the public which they represent" *(Board of Educ. v Areman, supra,* at 531). Moreover, "it is beyond the power of a school board to surrender

through collective bargaining a responsibility vested in the board in the interest of maintaining adequate standards in the classrooms as, for example, the granting or withholding of tenure" *(Honeoye Falls-Lima Cent. School Dist. v Honeoye Falls-Lima Educ. Assn.,* 49 NY2d 732, 734, *supra).* Further, this court has made it clear that a public institution's "ultimate responsibility to determine the qualifications required and preferred for a particular teaching position * * * and to determine whether a prospective applicant is possessed of those qualifications is a responsibility of the type that may not be bargained away, as it is central to the maintenance of adequate standards in the classroom" *(see, Matter of Three Vil. Teachers' Assn. v Three Vil. Cent. School Dist.,* 128 AD2d 626, 627, *supra).*

## IV

After consideration of the foregoing principles within the context of this appeal, it is our view that enforcement of the Grievance Board's determination would be violative of public policy. It is notable in this respect that the Grievance Board itself recognized the conflicting policy concerns implicated by the issues presented when it observed that the question before it was "whether to interpret Sections 10.1(e) and (f) as those subsections are written on a literal basis or to interpret the wording on the basis of public policy, in the best interests of the College, the students and the instructional staff". We must determine then, whether the Grievance Board's determination impermissibly narrows the College's authority in a matter "subject to restrictive policies which reflect governmental interests and public concerns" *(see, Board of Educ. v Areman, supra,* at 531). We conclude that it has precisely this effect.

In construing the collective bargaining agreement, the Grievance Board determined that the relevant provisions should be "literally" interpreted which, in the Board's own words, would require the College, in making its teaching assignments, to "rely *solely on the basis of departmental seniority lists* in determining which individual should be given preference for teaching any particular course"[3] (emphasis

---

**3.** In our opinion in the related case of *County of Nassau v New York State Pub. Employment Relations Bd.* (151 AD2d 168), we rejected a very similar construction of the contract, and with it, the Grievance Board's implicit assumption that a "literal" interpretation of the relevant provisions left no

added). Accordingly, pursuant to the Grievance Board's determination, after the initial hiring process and the one-semester probationary period during which a teacher may be removed only after two negative observations (§ 18.1), the College is foreclosed from any further exercise of its statutory authority to establish and reassess teacher qualifications. Indeed, as the Grievance Board itself recognized, the foregoing construction would excise from the collective bargaining agreement section 10 (1) (e)—which empowers the College to annually compile lists of qualified teachers—and apparently require the College to recognize as forever qualified adjunct teachers who have completed only one semester of service. It is fundamental that, "[a] public employee is 'qualified' for a position when he or she meets the conditions which the New York State Constitution, or the Legislature, or the appointing authority sets for eligibility to serve in that position" *(see, County of Nassau v New York State Pub. Employment Relations Bd.,* 151 AD2d 168, 181). The Grievance Board's decision, however, not only requires that the College retain adjunct personnel whom it has deemed unqualified to teach; it further mandates that the College afford such personnel what amounts to a permanent, tenured status after only one semester of teaching *(cf., Ricca v Board of Educ.,* 47 NY2d 385, 393; *Matter of Board of Educ. v Nyquist,* 31 NY2d 468). Moreover, and contrary to the Grievance Board's suggestion, the existence of a contractual provision authorizing the removal of a teacher after three negative observations (§ 19.9) is not ameliorative of the policy concerns identified above. While the foregoing provision ensures that the College need not retain incompetent personnel, the competence of a teacher is distinct from the question whether he or she possesses the basic qualifications required by the College as a prerequisite to appointment. By narrowing the College's authority to prescribe reasonable criteria with respect to qualifications, the Grievance Board's determination undermines the exercise of a prerogative indispensible to the College's continued ability to maintain academic standards in the classroom *(see, Honeoye Falls-Lima Cent. School Dist. v Honeoye Falls-Lima Educ. Assn., supra).* It is beyond the power of College to surrender a right so fundamentally associated with the furtherance of its

---

room for the College to reassess teacher qualifications or to make assignments from outside the departmental seniority lists. Rather, the court in that case, after reviewing the agreement, discerned a clear contractual right on the part of the College to set teacher qualifications.

basic educational mission as a public institution of higher learning. We conclude, therefore, that under the circumstances presented, enforcement of the Grievance Board's ruling would constitute a violation of the public policy of this State.

## V

Further, the Grievance Board's determination, which directs that appointments be made exclusively from seniority lists of adjunct faculty, has apparently jeopardized the College's accreditation. As noted earlier, in an affidavit executed by the president of Nassau Community College it was disclosed that the Commission on Higher Education had advised the college that its method of appointing adjunct faculty premised upon seniority "does not meet the Commissioner's accreditation criteria". While the record does not establish with certainty the full extent and immediacy of the threat to the college's accreditation, the concerns expressed by the College president are substantiated by the foregoing correspondence. Moreover, by letter dated September 4, 1985, addressed to former Nassau County Executive Francis T. Purcell, Theodore Black, the former Chancellor of the University of the State of New York, characterized the possibility of the College's losing its accreditation as *"serious"* and further wrote that, "I must tell you that in my eleven years' experience on the Board of Regents * * * I did not see or hear of a more clearly stated warning than this". Although the threat posed to the College's accreditation may not, standing alone, constitute a basis for setting aside the Grievance Board's determination, it is obvious that any loss of accreditation would undermine the significant educational objectives contemplated by the Legislature in establishing community colleges *(see,* Education Law §§ 6302, 6303).

The dissenter's contentions do not require a contrary result. Although the dissenter concedes that the Grievance Board employed "sweeping" language in rendering its determination and that its holding implicates a discernable policy issue involving academic standards, he argues that the policy in question is not sufficiently compelling to warrant intervention by the courts. Suffice it to say that where an arbitration award effectively requires a public institution to offer continued employment to personnel whom it has reasonably deemed lacking in qualifications, an overriding policy concern involv-

ing the nondelegable duty to oversee academic standards has been implicated *(see, e.g., Honeoye Falls-Lima Cent. School Dist. v Honeoye Falls-Lima Educ. Assn., supra).* Moreover, that the import of the present controversy extends beyond the mere construction of a contract, as the dissenter would have it, is amply demonstrated by the accrediting institution's independently reached conclusion that adherence to the type of hiring practice mandated by arbitration would be inconsistent with the minimum academic standards required for continued accreditation.

## VI

We conclude, therefore, that the enforcement of the contract provisions in question is violative of the public policy of this State. In accord with our present holding, the Grievance Board's inquiry should have been limited to ascertaining whether the grievants possessed the qualifications promulgated by the College. Since the Grievance Board did not consider this question in reaching its determination, we remit the matter to it to afford it the opportunity to do so.

Accordingly, the judgment is reversed, on the law, with costs, the determination of the Grievance Board is vacated, and the matter is remitted to the Grievance Board for further proceedings consistent herewith.

BROWN, J. P. (dissenting). "Where a dispute has been arbitrated pursuant to a broad arbitration agreement between the parties, the resulting award may not be vacated unless it is violative of a strong public policy, is totally irrational or clearly exceeds a specifically enumerated limitation on the arbitrator's power *(Matter of Silverman [Benmor Coats],* 61 NY2d 299, 308; *Matter of Board of Educ. v Dover-Wingdale Teachers' Assn.,* 61 NY2d 913; *Matter of Local Div. 1179 [Green Bus Lines],* 50 NY2d 1007; *Rochester City School Dist. v Rochester Teachers Assn.,* 41 NY2d 578)" *(Matter of Town of Callicoon [Civil Serv. Employees Assn.],* 70 NY2d 907, 909; *see, Matter of Board of Educ. v North Babylon Teachers' Org.,* — AD2d — [2d Dept, Nov. 20, 1989]). This policy of noninterference which has been adopted with respect to arbitration awards made, as here, pursuant to a broad arbitration clause consented to by the parties involved, serves the purpose of providing private and practical resolutions to disputes quickly and with minimum expense. Thus, the courts may not vacate

an award which is clearly legally incorrect, nor may they vacate an award which appears to be inequitable *(see, Rochester City School Dist. v Rochester Teachers Assn.,* 41 NY2d 578, *supra).* An arbitrator's virtually unfettered discretion in this regard will be checked, however, when the exercise thereof has been found to violate a strong public policy. "The courts, however, must exercise due restraint in this regard, for the preservation of the arbitration process and the policy of allowing parties to choose a nonjudicial forum, embedded in freedom to contract principles, must not be disturbed by courts, acting under the guise of public policy, wishing to decide the dispute on its merits, for arguably every controversy has as its core some issue requiring the application, or weighing, of policy considerations. Thus, there are now but a few matters of concern which have been recognized as so intertwined with overriding public policy considerations as to either place them beyond the bounds of the arbitration process itself or mandate the vacatur of awards which do violence to the principles upon which such matters rest" *(Matter of Sprinzen [Nomberg],* 46 NY2d 623, 630).

The public policy that the majority purports to protect by vacating the arbitration award in this case is the policy prohibiting a public authority from delegating its responsibility to oversee and establish academic standards. While I do not disagree with either the existence or the substance of such policy *(but see, Matter of Enlarged City School Dist. [Troy Teachers Assn.],* 69 NY2d 905, 907, n), I fail to see how the Grievance Board's award in this case is "so intertwined with overriding public policy considerations" that it cannot be permitted to stand. For all the sweeping language contained in its decision, the Grievance Board's award did only one thing—it prohibited the College from unilaterally violating the bargained-for contractual rights of several of its adjunct faculty members whom it had previously determined to be both qualified and competent, some of whom had been teaching at the College for many years, by depriving them of the opportunity of continuing to teach. In my view, the College has not established that the Grievance Board's award is so violative of strong public policy as to justify our abrogating the well-established judicial policy of noninterference in otherwise binding arbitration awards, particularly since under the terms of the parties' agreement the College always retained the right to remove an adjunct faculty member for unsatisfactory classroom performance.

Under the circumstances, I would affirm the judgment appealed from confirming the arbitrator's award.

LAWRENCE and EIBER, JJ., concur with KOOPER, J.; BROWN, J. P., dissents in a separate opinion.

Ordered that the judgment is reversed, on the law, with costs, the determination of the Grievance Board is vacated, and the matter is remitted to the Grievance Board for further proceedings consistent herewith.